**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

R. R. FREDEKING, II,

               Plaintiff,

v.                                       CIVIL ACTION NO.  3:19-0777

TRIAD AVIATION, INC.,
a corporation and
H & H PROPELLER SERVICE, INC.,
a corporation,

**MEMORANDUM OPINION AND ORDER**

This suit arises out of the allegedly faulty repair of a West Virginian's propeller airplane by two North Carolina-based companies. The defendants move to dismiss, arguing they lack the necessary minimum contacts with West Virginia for the Court to exercise personal jurisdiction. The Court agrees and therefore **GRANTS** the defendants' motion and **DISMISSES** this case.

**I. BACKGROUND**

Plaintiff R. R. Fredeking, II, is a resident of Cabell County, West Virginia, and the owner of a Piper Malibu single engine propeller airplane. ECF No. 1 ¶¶ 1, 9; ECF No. 7 ¶¶ 2–3. In early March 2019, Fredeking called defendants Triad Aviation, Inc. and H & H Propeller Service, Inc. (collectively "Triad") to discuss a needed overhaul of his airplane's engine and propeller. ECF No. 1 ¶ 10; ECF No. 7 ¶ 5–6. Triad did not answer, so Fredeking left a voicemail requesting a call back. ECF No. 7 ¶ 6. Triad's president later returned Fredeking's call and assured him that Triad could complete the needed repairs. ECF No. 1 ¶ 10; ECF No. 7 ¶ 7. Shortly after, Triad's maintenance coordinator emailed Fredeking two written proposals for the repairs. ECF No. 7 ¶ 8;

ECF Nos. 7-1, 7-2, 7-3. Fredeking informed Triad over the telephone that the proposals were satisfactory, and the maintenance coordinator sent Fredeking an email confirming this conversation. ECF No. 7 ¶ 9; ECF No. 7-4. Fredeking then delivered his airplane to Triad in North Carolina on or about March 11. ECF No. 1 ¶¶ 13–14; ECF No. 7 ¶ 10. While in North Carolina, he paid a $32,000 dollar deposit and signed a work authorization form. ECF No. 7 ¶ 10.

Shortly after Fredeking returned to West Virginia, Triad asked him over email to mail his log books. ECF No. 7 ¶ 11; ECF No. 7-5. Triad emailed Fredeking again on April 24 to inform him of problems with the repair and recommend solutions. ECF No. 7 ¶ 12; ECF No. 7-6. As work on the airplane continued, Fredeking communicated with Triad over the telephone several times. ECF No. 7 ¶ 14. On July 31, Triad informed Fredeking over email that the repairs were complete and explained that Fredeking would need to come to North Carolina for a test flight. ECF No. 7 ¶ 13; ECF No. 7-7. On August 13, Fredeking wired the remaining balance from West Virginia to Triad in North Carolina. ECF No. 7 ¶ 15.

Fredeking arrived in North Carolina on August 15 to test fly the airplane. ECF No. 1 ¶ 17. He performed two test flights at Triad's facility and noticed problems both times. ECF No. 7 ¶ 16. Triad made some adjustments and assured Fredeking no problems remained. *Id.* Fredeking asked Triad if he could conduct a third test by flying home to West Virginia. *Id.* Triad agreed that if Fredeking noticed any problems on his way to West Virginia, he could return the airplane for additional adjustments. *Id.* As part of the deal, Triad also promised a five hundred hour or one-year warranty. ECF No. 7 ¶ 18.

While flying over Wayne County, West Virginia, the airplane's propeller experienced an overspeed that was mostly likely caused by the propeller governor failing. ECF No. 1 ¶ 18; ECF No. 7 ¶ 17. The governor limits the propeller's maximum rotations per minute (RPM), so the

propeller does not exceed the 2500 RPM rated speed set by the manufacturer. ECF No. 1 ¶ 18. While flying, the airplane's tachometer reached 3000 RPM, the maximum speed the tachometer can display. *Id.* ¶ 19. Based on the sound of the engine and the indicated airspeed, Fredeking believes the engine and propeller speed exceeded 3300 RPM. *Id.* ¶ 20.

According to the engine manufacturer, an engine that exceeds 3300 RPM is no longer airworthy. *Id.* ¶ 21. The engine must be replaced or completely overhauled. *Id.* ¶ 21; ECF No. 7 ¶ 17. According to the propeller manufacturer, the propeller cannot return to service because the amount of the overspeed is unknown. ECF No. 1 ¶ 22; ECF No. 7 ¶ 17. As a result of this incident, Fredeking alleges three counts against Triad: breach of implied warranties, negligent repairs, and breach of contract. ECF No. 1 ¶¶ 24–36.

## II. LEGAL STANDARD

A court may dismiss claims for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). The plaintiff bears the burden "ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). "Where, as here, the district court addresses the question of personal jurisdiction on the basis of motion papers, supporting legal memoranda, and the allegations in the complaint, the plaintiff bears the burden [of] making a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009) (citation omitted). "In considering whether the plaintiff has met this burden, the district court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014) (citation and quotation marks omitted).

# III. DISCUSSION

A federal court sitting in diversity "has personal jurisdiction over a non-resident defendant if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016) (citation omitted). "Because the West Virginia long-arm statute is coextensive with the full reach of due process," these questions merge into one inquiry.[1] *In re Celotex Corp.*, 124 F.3d 619, 627–28 (4th Cir. 1997).

"A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to require the defendant to defend its interests in that state 'does not offend traditional notions of fair play and substantial justice.'" *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003) (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)). A defendant's contacts can establish general or specific jurisdiction. *Perdue Foods*, 814 F.3d at 189. Only specific jurisdiction is at issue here. *See* ECF No. 8.

The Fourth Circuit applies a three-prong test to determine whether specific jurisdiction over a nonresident defendant exists. *Universal Leather*, 773 F.3d at 559. Courts examine:

> (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims [arose] out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable.

---

[1] As Fredeking points out, West Virginia technically has two long-arm statutes. ECF No. 8, at 6–7; *see State ex rel. Ford Motor Co. v. McGraw*, 788 S.E.2d 319, 327–28 (W.Va. 2016). The state's primary long-arm statute, W. Va. Code § 56-3-33(a), confers personal jurisdiction on a nonresident who engages in one of seven enumerated acts, including "[t]ransacting any business" in West Virginia. The second statute, W. Va. Code § 31D-15-1501(d), is a narrow supplement that applies to foreign corporations and elaborates on the "[t]ransacting any business" provision. *Griffith & Coe Advert., Inc. v. Farmers & Merchants Bank And Tr.*, 599 S.E.2d 851, 854 (W.Va. 2004); *McGraw*, 788 S.E.2d at 327. The Fourth Circuit referred to § 56-3-33(a) when it held in *In re Celotex Corp.* that "the West Virginia long-arm statute is coextensive with the full reach of due process." 124 F.3d at 627 (citing *Pittsburgh Terminal Corp. v. Mid Allegheny Corp.*, 831 F.2d 522, 525 (4th Cir. 1987)). Because § 31D-15-1501(d) supplements § 56-3-33(a), the Court also treats it as coextensive with due process.

*Id*. The "touchstone" of this analysis is whether the defendant "engaged in some activity purposefully directed toward the forum state." *In re Celotex*, 124 F.3d at 628 (citation omitted). A court need not consider the second and third prongs if the plaintiff does not make a prima facie showing that the defendant purposefully availed itself of the privilege of conducting business in the forum state. *See Consulting Eng'rs*, 561 F.3d at 278.

To determine whether a defendant purposefully availed itself of the privilege of conducting activities in the forum state, courts consider many factors, including: (1) whether the defendant maintains offices or agents in the forum state; (2) whether the defendant owns property in the forum state; (3) whether the defendant reached into the forum state to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the forum state; (5) whether the parties contractually agreed that the law of the forum state would govern disputes; (6) whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; (7) the nature, quality, and extent of the parties' communications about the business being transacted; and (8) whether the performance of contractual duties was to occur within the forum. *Consulting Eng'rs*, 561 F.3d at 278.

Here, the first, second, fifth, sixth, and eighth factors all support finding a lack of purposeful availment. Triad's president declared in his affidavit that Triad is not registered to do business in West Virginia, does not direct advertisements to West Virginia, does not maintain offices or agents in West Virginia, and does not own property in the state. ECF No. 5-1 ¶¶ 8–11. The parties' warranty agreement identifies North Carolina law as the controlling law for any dispute. *Id.* ¶ 22; ECF No. 5-2, at 2. No Triad agents came to West Virginia to speak with Fredeking about the business transaction. *Id.* ¶ 15. And, the contracted repairs occurred exclusively in North Carolina. *Id.* ¶ 18. Fredeking does not dispute these facts.

Fredeking's arguments only implicate the third, fourth, and seventh factors. Regarding the third factor, the Fourth Circuit has held that determining who initiated contact "significantly impact[s] the outcome of a personal jurisdiction analysis." *Universal Leather*, 773 F.3d at 562. Fredeking minimizes his initial voicemail and argues that Triad contacted him to solicit his business. ECF No. 8, at 2. But this characterization is unreasonable. Fredeking discovered Triad after searching for companies on the internet, called Triad, and specifically requested the company return his call to discuss his needed repairs. ECF No. 7 ¶ 5–6. These events in no way support finding that Triad "reached into" West Virginia to initiate business with Fredeking. *See Consulting Eng'rs*, 561 F.3d at 278.

Fredeking's argument that Triad solicited business in West Virginia through its website is also unavailing. *See* ECF No. 8, at 5. The Fourth Circuit recently addressed this issue in *Fidrych v. Marriott International, Inc*. No. 18-2030, 2020 WL 986674 (4th Cir. Mar. 2, 2020). There, the court clarified that "the mere fact that the website is accessible in a given state does not mean that [the defendant company] is targeting its activities at that state." *Id.* at *12. An interactive website that "create[s] a continuing, back-and-forth relationship" may support finding purposeful availment. *Id.* at *13. But Fredeking explained that Triad's website is passive and informational. ECF No. 8, at 5. Thus, the website is merely "the digital equivalent of a toll-free telephone number, providing a simple, cost-free way for customers to contact the company." *Fidrych*, 2020 WL 986674, at *13. This kind of website, accessible to all and specific to none, does not create the substantial connection to West Virginia needed for personal jurisdiction. *Id.* at *12; *see also Carefirst of Md.*, 334 F.3d at 399 (citations omitted) ("If, by contrast, the defendant's site is passive, in that it merely makes information available, the site cannot render him subject to specific personal jurisdiction in a foreign court.").

Per the fourth factor, Fredeking argues Triad engaged in a significant and long-term business transaction with him and that this single contact is sufficient for purposeful availment. ECF No. 8, at 13–14; *see Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc*., 334 F.3d 390, 397 (4th Cir. 2003) (holding that "[e]ven a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact"). However, for a single contract to establish personal jurisdiction, the contract must create a long-standing business relationship or otherwise create continuing obligations between the parties. *Perdue Foods*, 814 F.3d at 191 (noting the distinction between "a contract—which cannot, by itself, establish purposeful availment," and "a contract with continuing obligations," which can) (citation omitted). The paradigmatic example is *Burger King Corp. v. Rudzewicz*, where the Supreme Court held Florida could exercise jurisdiction over a Michigan franchisee because "he entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida." 471 U.S. 462, 480 (1985).

In contrast to *Burger King*, Triad entered into a relatively short and simple transaction. From initial contact to completion of the repairs, the transaction only lasted approximately five months. Fredeking argues this duration is considerable, but five months does not constitute a "long-term" relationship when compared to the twenty-year contract in *Burger King. See also Perdue Foods*, 814 F.3d at 188, 192 (finding no purposeful availment even though the parties' trademark agreement would remain in force "for the life of the respective trademarks"); *Justice Family Farms LLC v. Guess Irr. Co. LLC*, No. 5:11-CV-00426, 2012 WL 775063 (S.D.W. Va. Mar. 8, 2012) (holding no purposeful availment where the business transaction lasted longer than five months). Fredeking also emphasizes, without any support, that the contract's approximately $104,000 dollar value is evidence of its significance. However, "significance" in the context of

establishing purposeful availment has more to do with how a contract strengthens the defendant's contacts with the forum state, not the contract's monetary value. Beyond routine email and telephone communications, the contract here did nothing to strengthen Triad's contacts with West Virginia.

Fredeking also argues the parties' warranty agreement constitutes a "continuing obligation" supporting purposeful availment, but this obligation is negligible. While the warranty did extend the parties' relationship, a relatively short guarantee that a party may or may not invoke is a far weaker obligation than an agreement that structures an ongoing relationship or anticipates future transactions. *See Work While U-Wait, Inc. v. Teleasy Corp*., No. 2:07-00266, 2007 WL 3125269, at *4 (S.D.W. Va. Oct. 24, 2007) (crediting the existence of a warranty but finding more significant a purchase order addendum that explicitly contemplated future sales). Thus, many courts have held warranty obligations, without more, are insufficient for purposeful availment. *E.g. Dinkel v. Crane Care, Inc*., No. 09-388 LH/RHS, 2010 WL 11453201, at *8 (D.N.M. Jan. 28, 2010) ("A warranty obligation owed to a resident of the forum, without more, is insufficient to satisfy the purposeful availment requirement."); *Marshall v. Bounds Autoplex, L.L.C*., No. 3:08-CV-00135 BSM, 2008 WL 4833112, at *2–3 (E.D. Ark. Nov. 5, 2008) (holding a dealership that performed work under a manufacturer's warranty in Texas for a plaintiff in Arkansas "neither purposely availed itself of the privilege of conducting activities within Arkansas or invoked the benefits and protections of its laws"). The warranty agreement here is especially weak for supporting purposeful availment because the warranty requires future repairs to occur in North Carolina and mandates that North Carolina law apply to future disputes. *See Consulting Eng'rs*, 561 F.3d at 278 (holding where the contractual duties are performed and which state's law applies are relevant for determining purposeful availment).

Further in support of the fourth factor, Fredeking points to Triad's admission that it earns less than one percent of its revenue through services or sales to individuals and businesses in West Virginia. ECF No. 8, at 5–6; ECF No. 5-1 ¶ 12. Yet, less than one percent is not a significant amount. *Compare Farrar v. Cessna Aircraft Co.*, No. 2:18-CV-00461, 2019 WL 1386393, at *5 (S.D.W. Va. Mar. 27, 2019) (finding defendant's revenue from West Virginia sales did not support purposeful availment because it made up less than one percent of the defendant's national revenue) *with Bassett v. Strickland's Auto & Truck Repairs, Inc.*, No. 1:17-cv-590, 2018 WL 3542868, at *5 (M.D.N.C. July 23, 2018) (finding defendant's sales to the forum state supported purposeful availment because the defendant billed sixty-two percent of its invoices to customers in that state). There is also no indication that Triad specifically targeted and solicited West Virginians to accrue this revenue. To the contrary, Triad's president declared that Triad does not direct advertisements to West Virginia and does not maintain offices or agents there. ECF No. 5-1 ¶¶ 9, 11; *see Fed. Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 658–59 (4th Cir. 1989) (finding no purposeful availment even though the defendant had some sales in the forum state, in part, because the defendant did not "directly advertise or solicit customers" there).

In line with the seventh factor, Fredeking stresses the nature and extent of his communications with Triad throughout their transaction. ECF No. 8, at 3. While in West Virginia, he spoke to Triad over the phone and email several times, received two written proposals, issued his authorization for additional parts and services, communicated payment terms, and wired money. ECF No. 7 ¶¶ 8–15. However, "even very extensive communications are not dispositive of the defendant's purposeful availment, unless the parties had an extensive, substantive, or continuing relationship that tied their behavior to the forum state." *March-Westin Co., Inc. v. Swinerton Builders, Inc.*, No. 1:17CV199, 2018 WL 2471451, at *5 (N.D.W. Va. June 1, 2018)

(holding no personal jurisdiction over out-of-state defendant based on emails with plaintiff because "the parties' communications are exactly what one might expect between sophisticated parties negotiating a relatively significant . . . contract") (citation omitted). For this reason, courts often hold communications similar to those here are insufficient for purposeful availment. *E.g. Consulting Eng'rs*, 561 F.3d at 281–82 (holding that, even combined with a contract's choice-of-law provision, "four brief emails, several telephone conversations about [a contract], and the exchange of the various drafts" were insufficient to show purposeful availment); *Justice Family Farms*, 2012 WL 775063, at *5 (holding nonresident company did not purposefully avail itself of the forum state despite negotiations over email, telephone, and one in-person meeting); *DeCusati v. Reiss Eng'g, Inc.*, No. 3:15-CV-204-JAG, 2015 WL 4622494, at *3 (E.D. Va. July 30, 2015) (holding "[t]elephone calls, email and telex messages, and letters do not form a basis for personal jurisdiction" unless the defendant reaches into the state to transact business); *Dehner Co., Inc. v. Appromed Corp.*, No. 8:16CV7, 2016 WL 9408573, at *4 (D. Neb. Sept. 14, 2016) (holding nonresident defendant was not subject to personal jurisdiction despite directing fourteen emails, multiple telephone calls, a dealer application, and a proposed written agreement to the resident plaintiff). Here, too, the Court finds Triad's communications are not substantial enough to outweigh the other relevant factors. Indeed, the parties' need to resort to telephone and email communications in between Fredeking's visits to North Carolina underscores the attenuated nature of Triad's contacts with West Virginia.

In sum, after considering Triad's alleged contacts with West Virginia and construing all allegations in Fredeking's favor, the Court concludes Fredeking failed to make a prima facie showing that Triad purposefully availed itself of the privilege of conducting business in West Virginia. Because Fredeking failed to make a prima facie showing of purposeful availment, the

Court need not consider whether Fredeking's claims arose out of Triad's activities in West Virginia or whether the exercise of personal jurisdiction is constitutionally reasonable. *See Consulting Eng'rs*, 561 F.3d at 278. Because Triad lacks sufficient minimum contacts with West Virginia, the Court cannot exercise personal jurisdiction over Triad in this case.

### IV. CONCLUSION

For these reasons, the Court **GRANTS** the defendants' Motion to Dismiss, ECF No. 5, and **DISMISSES** this case without prejudice. The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.

ENTER:          March 27, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE